IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

TIGER FIBERS, LLC, *et al.*            )
                                       )
              Plaintiffs,              )
                                       )
       v.                              )       No. 1:07cv1106 (AJT/TCB)
                                       )
ASPEN SPECIALTY INSURANCE              )
       COMPANY,                        )
                                       )
              Defendant.               )
_____)

## MEMORANDUM OPINION

This matter is before the Court on the Motion for Summary Judgment filed by Plaintiffs

Atlantic Recycling Technologies, LLC ("Atlantic") and Tiger Fibers, LLC ("Tiger Fibers") and

the Motion for Summary Judgment filed by Defendant Aspen Specialty Insurance Company

("Aspen"). These motions were filed on October 17, 2008, and this Court heard oral argument

on these motions on November 14, 2008, following which this Court took these motions under

advisement.

This case concerns the validity and application of an Aspen property casualty insurance

policy with respect to Plaintiffs' claims as a result of a fire that occurred on December 7, 2005.

As it pertains to Atlantic, the Aspen policy provides various property and business interruption

insurance with respect to an insulation manufacturing business operated by Atlantic in a building

located in Lawrenceville, Virginia, which Atlantic leases from the Industrial Development

Authority of Brunswick County, Virginia ( the "IDA property" or the "Lawrenceville property").[1]

---

[1] The Aspen policy was issued to Atlantic, Tiger Fibers and Tiger Fibers, Inc. It originally provided
coverage for both the Lawrenceville property and also a leased property in Ronda, North Carolina that was used by

Plaintiffs and Defendant have both moved for summary judgment. The Plaintiffs claim that the Aspen policy provides building coverage for damage to the Lawrenceville property, that the coverage is valid and enforceable and that Aspen breached the policy by failing to provide coverage for fire and smoke damage to the insured building.[2] Aspen, however, claims that the building coverage is unenforceable. Aspen also argues that the Plaintiffs' other coverage claim for personal property damage is not ripe for adjudication and that Plaintiffs are not entitled to recover costs and attorney's fees pursuant to Va. Code Ann. § 38.2-209, which provides for such an award where the court determines that the insurer, not acting in good faith, either denied coverage or refused to make a payment under the policy.

There are several issues before the Court. Briefly summarized, the first issue is whether the building coverage provided by the Aspen Policy is the result of a "scrivener's error" or "mutual mistake." The second issue is whether Atlantic, as a lessee, has an "insurable interest" in the Lawrenceville property sufficient to support the policy's building coverage.[3] The third issue is whether Atlantic's claim for "recoverable depreciation" with respect to its personal property claim is ripe for adjudication since there is no evidence that Plaintiffs have actually replaced that property, a condition precedent under the policy. The fourth issue is whether

---

Tiger Fibers, LLC to operate a conventional fiber processing business. The coverage for the Ronda, N.C. location is not at issue in this litigation and Tiger Fibers, Inc. is not a party to this litigation.

[2] The scope of Plaintiffs' motion is not entirely clear. The motion itself requests summary judgment "as to the claims based upon breach of contract and declaratory judgment." Count I (Breach of Contract) and Count II (Declaratory Judgment), however, make a variety of claims, some of which are not the subject of Plaintiffs' memoranda or argument in support of their motion. Moreover, many of the parties' arguments are not directed to specific Counts, but rather to certain issues pertaining to the Plaintiffs' claims. Plaintiffs' motion is, in reality, a motion for partial summary judgment and the Court will treat it as such.

[3] There is no contention that Tiger Fibers, LLC has an insurable interest in the Lawrenceville property, even though the Motion for Summary Judgment was brought in the name of both Plaintiffs.

2

Plaintiffs have a claim for costs and attorney's fees under Va. Code Ann. § 38.2-209.

All parties contend that there are no genuine issues of material fact with respect to their respective motion and that each is entitled to summary judgment in their favor. For the reasons set forth herein, Plaintiffs' motion is GRANTED and Defendant's motion is GRANTED in part and DENIED in part.

## I. BACKGROUND

Based on the parties' submissions and the representations of counsel at oral argument, the undisputed facts are as follows:

Atlantic owns and operates a manufacturing business at the Lawrenceville property, which is located at 853 Industrial Park Drive, Lawrenceville, Virginia 23868. In September, 2005, Aspen issued Policy PP000508 to Atlantic with respect to the Lawrenceville property (the "Aspen Policy"). At the time of the fire on December 7, 2005, the Aspen Policy was in full force and effect as to the Lawrenceville property.

At all material times herein, the Lawrenceville property has been owned by IDA and leased to Atlantic pursuant to a lease dated July 21, 2004. Lease, Pls.' Ex. 1.[4] The initial term of the lease is five years with two five year renewal options. *Id.* at ¶ 3. The lease grants Atlantic an option to purchase the Lawrenceville property. *Id.* at ¶ 16. Under the terms of the purchase option, the purchase price is reduced by a portion of each monthly rental payment.[5] The lease

---

[4] The exhibits cited in this Memorandum Opinion are those attached to the Plaintiffs' Motion for Summary Judgment (cited as "Pls.' Ex.") and the Defendant's Motion for Summary Judgment (cited as "Def.'s Ex.").

[5] The option price is $912,500.00. The monthly lease payments are $7,604.00. Approximately forty percent of each payment, $3,041.60, is to be applied to the purchase price in the event Atlantic exercises its purchase option.

3

also requires Atlantic to maintain the property in "as good a condition" as it existed at the beginning of the lease term and to "restore possession of the Property to the IDA in good condition, reasonable wear and tear excepted." *Id.* at ¶¶ 11, 12, 18. If Atlantic "fails to maintain the Property as hereunder required, the IDA shall have the right to do so and in that event shall have the right to recover from [Atlantic] all costs expended by the IDA for that purpose." *Id.* at ¶ 11. The lease also allocates certain duties and responsibilities with respect to damage to the building. The lease requires IDA to maintain "property insurance" at Atlantic's expense. *Id.* at ¶ 9. In the event of damage to the building so extensive that it cannot be occupied by Atlantic, the lease provides that "for so long as such condition exists the rent otherwise due from [Atlantic] to the IDA shall be abated." *Id.* at ¶ 12. In the event of such damage, "IDA shall have the right and privilege, but neither the duty nor obligation, to effect such repairs as are necessary to restore the Property to a functional condition." *Id.* If IDA does not restore the building to a "functional condition," the lease is terminated without penalty to either party. *Id.*

In the summer of 2005, Plaintiffs contacted a licensed Virginia insurance agency, Franey Muha Alliant Insurance Services, Inc. ("Franey"), about obtaining insurance for both the Lawrenceville property and also the site located in Ronda, North Carolina. Plaintiffs' initial contact at Franey was Joseph E. Potter. Franey prepared an insurance proposal dated May 25, 2005 (the "May 25, 2005 Proposal").[6] In August 2005, Franey contacted All Risks, Ltd. ("All Risks"),[7] a licensed Virginia insurance broker, and submitted to All Risks an insurance

---

[6] Plaintiffs and Aspen dispute whether Plaintiffs ever received a copy of the May 25, 2005 Proposal and whether it contains a proposal for building coverage.

[7] All Risks is an independent insurance broker licensed to sell property and casualty insurance in the Commonwealth of Virginia. Aspen has had a written brokerage agreement with All Risks since November 2003.

application dated August 8, 2005 (the "August 8, 2005 Application").[8] On August 24, 2005, All Risks, in turn, submitted the insurance application prepared by Franey to Aspen.

Upon receiving the August 8, 2005 Application, Aspen began its underwriting process, following which Aspen prepared and submitted to All Risks a quote for insurance coverage with respect to both the Lawrenceville property and the Ronda, North Carolina property. The parties do not dispute that this quote does not contain any proposal to extend building coverage. *See* Def.'s Stmt. of Undisputed Facts, ¶ 44; Pls.' Stmt. of Disputed Facts, ¶ 44. All Risks forwarded the quote to Franey. On September 1, 2005, Franey requested that All Risks "advise Aspen to bind coverage Short Term effective 9/1/05 to 8/1/06." *See* Email, Def.'s Ex. 24.

In response to All Risks' request to "bind coverage," Aspen prepared the Aspen Policy, which was reviewed on September 27, 2005 by Aspen's underwriter, Ethan Gow, and then signed by Aspen's "Authorized Representative." Aspen then mailed the Aspen Policy to All Risks on or about September 28, 2005. All Risks reviewed the Aspen Policy on October 4, 2005 and sent it to Franey, with a request to review the Aspen Policy. A copy of the Aspen Policy was also sent to the Plaintiffs with an attached notice on All Risks' letterhead that stated:

---

[8] Plaintiffs and Aspen dispute whether Plaintiffs ever received a copy of the August 8, 2005 Application before this litigation and whether it requests building coverage.

**PLEASE REVIEW**
**THIS POLICY**
**CAREFULLY**

THE COVERAGES AND TERMS OF THE POLICY
MAY DIFFER FROM THOSE REQUESTED IN
YOUR APPLICATION.

PLEASE REVIEW THIS POLICY AND ADVISE US
IMMEDIATELY IN WRITING OR BY FAX,
IF YOU BELIEVE ANY CHANGES SHOULD BE
MADE IN THE POLICY.

*See* Notice, Pls.' Ex. 15.

Franey also sent a copy of the Aspen Policy to Plaintiffs with a "Coverage Summary,"

which states that "[i]n the event of a discrepancy between this summary and the actual policy, the

terms and conditions of the policy will prevail." Summary, Pls.' Ex. 16. The Aspen Policy

further provides that "[t]his policy contains all the agreements between you and us concerning

the insurance afforded. . . . This policy's terms can be amended or waived only by endorsement

issued by us and made a part of this policy." Policy, Common Policy Conditions, Section B,

Pls.' Ex. 9.

As originally issued, the Aspen Policy covered both the Lawrenceville property and the

Ronda, North Carolina property for the period September 1, 2005 through August 1, 2006.[9] The

Aspen Policy provides three categories of property insurance coverage: (1) damage to the

building structure itself; (2) damage to personal business property contained in the building; and

(3) losses attributable to "business interruption." Specifically, the Summary of Insurance and

---

[9] The locations of the insured properties are referenced on the policy page titled "Summary of Insurance and Special Provisions" as "per schedule dated 08/08/05 on file with the company." The parties confirmed at oral argument that this "schedule" is the insurance application dated August 8, 2005 that was submitted to Aspen.

6

Special Provisions page states:

Valuation:

| Coverage | RC | ACV | ALS | Other: | Coinsurance |
|---|---|---|---|---|---|
| Building | ☒ | ☐ | ☐ | ☐ | 80% |
| Business Personal Property/ Contents | ☒ | ☐ | ☐ | ☐ | 80% |
| Business Interruption/ Loss Income | ☐ | ☐ | ☐ | ☒ | |

Policy, Summary of Insurance and Special Provisions, Pls.' Ex. 9.

The specific terms of the coverages provided are found in the "ISO Special Forms" that apply to the Aspen Policy. Policy, Common Policy Declarations and Schedule of Applicable Forms, Pls.' Ex. 9. The applicable ISO Special Forms are listed in the Schedule of Applicable Forms. *See id.* Among the applicable ISO Special Forms is the "Building and Personal Property Coverage Form." That form provides that "[w]e [Aspen] will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Policy, Building and Personal Property Coverage Form, Section A, Pls.' Ex. 9. "Covered Property" includes "**Building**, meaning the building or structure described in the Declarations." *Id.* at Section A.1. The "Covered Causes Of Loss" include fire and smoke damage. *Id.* at Section A.3; Policy, Causes of Loss – Special Form, Pls.' Ex. 9. Following the Aspen Policy's issuance but before the fire on December 7, 2005, Aspen issued a number of endorsements that had the effect of eliminating all coverage for the Ronda, North Carolina property but leaving unchanged the coverage provided for the Lawrenceville property.[10]

---

[10] Endorsement 1, dated October 13, 2005, added K Bank as a loss payee. On October 17, 2005, Aspen

7

As reflected on the Summary of Insurance and Special Provisions page, building and business property damage claims are valued based on "replacement cost." Under that valuation method, the insured is entitled to the full cost of replacing the damaged property, but only after the property has in fact been replaced. *See* Policy, Building and Personal Property Coverage Form, Section G.3, Pls.' Ex. 9. Nevertheless, the policy allows the insured to request a payment for loss based on "the actual cash value" method in advance of actual replacement of the damaged property, with an additional payment to be received equal to the difference between the "actual cash value" and the "replacement cost" once the cost is actually incurred to replace the property. *Id.*

On December 7, 2005, a fire occurred at the Lawrenceville property. At the time of the fire, the lease was in full force and effect and Atlantic was operating its business on the premises. As a result of the fire, Atlantic's business operations were interrupted, personal business property was damaged or destroyed and aspects of the building were damaged.[11] Atlantic submitted claims under each of the three different types of coverage.[12] In response to those

---

mailed a notice of cancellation of Aspen Policy PP000508. Endorsement 2, dated November 22, 2005, rescinded the cancellation effective December 1, 2005. On the same day, Endorsement 3 deleted only the Ronda, North Carolina location from the policy. Because Endorsement 3 incorrectly removed $2 million business income coverage instead of $1 million, Endorsement 4, dated January 24, 2006, corrected the error effective December 1, 2005. Endorsement 5, dated June 8, 2006 and effective September 1, 2005, confirms coverage at Lawrenceville for $1,000,000 in contents coverage and $1,100,000 in business interruption coverage. Endorsement 5A, dated April 3, 2007 and effective September 1, 2005, further confirmed coverage for Lawrenceville for $1,000,000 in contents coverage, $1,100,000 in business interruption coverage and $50,000 extra expense coverage. The parties are in agreement that the original coverage provided for the Lawrenceville building remained in effect after the issuance of the endorsements and was in effect on the date of the fire.

[11] The fire damage that is the subject of Plaintiffs' building coverage claim is damage to the insulation that is attached to the ceiling of the building, which is a metal structure.

[12] Defendant contends that Plaintiffs did not submit a building damage claim, but only an estimate of damages regarding the Lawrenceville building.

claims, Aspen acknowledged coverage for business interruption and business personal property claims.[13] However, Aspen disclaimed building coverage for any damage to the building itself.[14] Plaintiffs filed this action on November 30, 2007.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only if the record shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Apps. & Serv. Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the absence of a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson*, 477 U.S. at 248. Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To defeat a properly supported motion for summary judgment, the non-moving party "must set forth specific facts showing that there is a

---

[13] Plaintiffs received a final payment on October 20, 2006 for their business personal property claim, as valued under the "actual cash value" method. As discussed *infra*, Plaintiffs now seek a declaratory judgment that they are entitled to an additional payment of the difference between the replacement cost value and the actual cash value (*i.e.*, the "recoverable depreciation"). As to the business interruption claim, pursuant to this Court's order dated September 18, 2008, the parties submitted that claim to the appraisal process specified in the policy and the value of that claim is not implicated in the pending summary judgment motions.

[14] By letter dated July 21, 2006, Plaintiffs, through their public adjuster Goodman-Gable-Gould, submitted a fire damage claim for damage to the insulation. By letter dated August 2, 2006, Aspen responded, without explanation, that the Aspen policy does not provide building coverage. By letter dated August 18, 2006, Plaintiffs, through their adjuster, reaffirmed their position that the Aspen Policy does provide building coverage. Plaintiffs contend that the cost to replace the insulation using a like kind replacement would be $789,877.88, and the cost to replace the insulation using an alternative procedure, not in a like kind manner, would be $467,620.36. Aspen, however, contends that a VACO adjuster, Mr. Woodyard, determined that the loss was slightly in excess of $28,000.00. The amount of damages and determination of replacement cost is not currently before the Court.

genuine issue for trial." *Anderson*, 477 U.S. at 247-48 ("[T]he mere existence of some alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for

summary judgment; the requirement is that there be no genuine issue of material fact.").

Whether a fact is considered to be "material" is determined by the substantive law, and "[o]nly

disputes over facts that might affect the outcome of the suit under the governing law will

properly preclude the entry of summary judgment." *Id.* at 248.  The facts shall be viewed, and all

reasonable inferences drawn, in the light most favorable to the non-moving party. *Id.* at 255; *see*

*also Lettieri v. Equant Inc.*, 478 F.3d 640, 642 (4th Cir. 2007).

### III. ANALYSIS

**A.     Choice of Law and Contract Interpretation**

This Court has jurisdiction solely on the basis of diversity of citizenship jurisdiction, and

the substantive law of Virginia therefore applies. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78

(1938).  Under Virginia's choice of law rules, Virginia substantive law applies because the

parties seek an interpretation of an insurance contract completed and entered into in Virginia.

*Buchanan v. Doe*, 246 Va. 67, 71, 431 S.E.2d 289, 291 (1993) ("[T]he law of the place where an

insurance contract is written and delivered controls issues as to its coverage.").[15]  The Court is

therefore obligated to evaluate under Virginia law the parties' contentions concerning the

coverage afforded under the Aspen Policy.

The interpretation of a contract is a question of law.  *City of Chesapeake v. States Self-*

*Insurers Risk Retention Group, Inc.*, 271 Va. 574, 578, 628 S.E.2d 539, 541 (2006); *Bentley*

*Funding Group, L.L.C. v. SK&R Group, L.L.C.*, 269 Va. 315, 609 S.E.2d 49, 53 (2005).  It is

10

settled under Virginia law that courts "interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document." *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993). "[W]hen the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning and enforce the policy as written." *Partnership Umbrella, Inc. v. Federal Ins. Co.*, 260 Va. 123, 133, 530 S.E.2d 154, 160 (2000); *see also Bridgestone/Firestone, Inc. v. Prince William Square Assocs.*, 250 Va. 402, 407, 463 S.E.2d 661, 664 (1995); *Wilson v. Holyfield*, 227 Va. 184, 187, 313 S.E.2d 396, 398 (1984). Words should be "given their usual, ordinary, and popular meaning. No word or clause in the contract will be treated as meaningless if a reasonable meaning can be given to it, and there is a presumption that the parties have not used words needlessly." *D.C. McClain, Inc. v. Arlington County*, 249 Va. 131, 135-36, 452 S.E.2d 659, 662 (1995).

If a court finds that a contract lacks clarity, the "court should resort to parol evidence to ascertain the true intention of the parties." *Aetna Cas. & Sur. Co. v. The Fireguard Corp.*, 249 Va. 209, 215, 455 S.E.2d 229, 232 (1995). However, ambiguities "must be found on the face of the policy," *Nationwide Mut. Ins. Co. v. Wenger*, 222 Va. 263, 268, 278 S.E.2d 874, 877 (1981), and language is ambiguous if it is understood in more than one way. *Lincoln Nat'l Life Ins. Co. v. Commonwealth Corrugated Container Corp.*, 229 Va. 132, 136-37, 327 S.E.2d 98, 101 (1985). Moreover, ambiguities are always interpreted against the insurer and must be construed to effectuate coverage. *Joseph P. Bornstein, Ltd. v. Nat'l Union Fire Ins. Co.*, 828 F.2d 242, 245 (4th Cir. 1987). Thus, any ambiguity will be given an interpretation providing coverage, rather

---

[15] The parties agree that Virginia law applies.

than withholding coverage. *S.F. v. W. Am. Ins. Co.*, 250 Va. 461, 465, 463 S.E.2d 450, 452

(1995) (citing *St. Paul Fire & Marine Ins. Co. v. S.L. Nusbaum & Co.*, 227 Va. 407, 411, 316

S.E.2d 734, 736 (1984). This doctrine is sometimes referred to as the rule of *contra proferentem.*

*See, e.g., Kunin v. Benefit Trust Life Ins. Co.*, 910 F.2d 534, 540 (9th Cir.) (in light of the

expertise and experience possessed by drafters of insurance policies, the rule of *contra*

*proferentem* applies in all fifty states and the District of Columbia to construe all ambiguities in

favor of the insured), *cert. denied*, 498 U.S. 1013 (1990).

Based on the principles referenced above, Virginia courts consistently apply two rules in

construing the language of insurance policies. First, "where language in an insurance policy is

susceptible of two constructions, it is to be construed liberally in favor of the insured and strictly

against the insurer." *Jefferson-Pilot Fire & Cas. Co. v. Boothe, Prichard & Dudley*, 638 F.2d

670, 674 (4th Cir. 1980) (citing *Fidelity & Cas. Co. of N.Y. v. Fratarcangelo*, 201 Va. 672, 112

S.E.2d 892 (1960)). Second, "where two interpretations equally fair may be made, the one which

permits a greater indemnity will prevail." *Id.* (citing *Ayres v. Harleysville Mut. Cas. Co.*, 172

Va. 383, 2 S.E.2d 303 (1939)). These rules arise out of the fact that insurance policies are

drafted by insurance companies for the principal purpose of protecting the insured. *United Servs.*

*Automobile Ass'n v. Webb*, 235 Va. 655, 657, 369 S.E.2d 196, 198 (1988).

**B.    Aspen's Claims to Avoid Coverage**

There is no dispute that, on its face, the Aspen Policy provides building coverage for the

Lawrenceville property. Aspen, however, seeks to avoid that coverage under three theories. The

first is that the building coverage indicated in the Aspen Policy was a result of a "scrivener's

error." The second is that the Aspen Policy fails to reflect the parties' prior understanding and

12

agreement that the Aspen Policy would not include building coverage and that the Aspen Policy as issued, therefore, reflects a mutual mistake and should be reformed to eliminate building coverage. Finally, Aspen argues that Plaintiffs do not have an insurable interest sufficient to obtain coverage for damage to a building that they lease and do not own.

     1.     Scrivener's Error and Mutual Mistake

In support of its claim of a scrivener's error and mutual mistake, Aspen claims that the parties never intended the Aspen Policy to provide building coverage and that it mistakenly marked an "X" in the box indicating that building coverage was valued at replacement cost. *See* Policy, Summary of Insurance and Special Provisions. Rather, Aspen claims that it should have left that box blank, with no valuation method checked for building coverage. Implicit in Aspen's position is that, had none of the boxes indicating a valuation method for building coverage been checked, the Aspen Policy would not have provided building coverage. On that basis, Aspen seeks to avoid building coverage for the Lawrenceville property under the doctrines of scrivener's error and mutual mistake.

Aspen relies on a series of documents exchanged between Aspen, All Risks and Franey to support its position that the parties never intended that the policy would provide building coverage. Specifically, Aspen contends that the August 8, 2005 Application prepared by Franey and submitted by All Risks did not request building coverage for either the Lawrenceville property or the Ronda, North Carolina property. Aspen further contends that it never received certain information it would have needed concerning the buildings to evaluate the risks associated with setting a premium for building coverage, that it never conducted its standard underwriting analysis for building coverage and that its quote did not include any premium for

building coverage.  As further evidence of Plaintiffs' intention not to obtain building coverage, Aspen points to the lack of such coverage under Plaintiffs' previous insurance policies for the Lawrenceville property and Ronda, North Carolina property and also to the lease between Atlantic and IDA, which requires IDA, not Atlantic, to maintain property insurance coverage for the building at Atlantic's expense.

Plaintiffs, on the other hand, have submitted sworn declarations and deposition testimony that they asked Mr. Potter, one of Franey's agents, to obtain building coverage on the two factory sites and that in subsequent conversations with Mr. Potter, Mr. Potter confirmed that Plaintiffs had asked for building coverage.  *See* Deposition of Craig Stuart-Paul, Pls.' Ex. 7, at 50:13-21. Plaintiffs have further submitted sworn statements that (1) they never signed the application submitted by Franey to All Risks; (2) never saw the application before this litigation; (3) never saw the proposal for insurance drafted by Aspen and circulated to All Risks and Franey; and (4) never saw Aspen's quote set forth in its proposal or the "binder."  There is no evidence in the record that contradicts those statements.[16]  Plaintiffs further argue that the descriptions and requests for insurance contained in the August 8, 2005 Application, the May 25, 2005 Proposal and the "binder" do not necessarily exclude building coverage, or are at least ambiguous,[17] and that any ambiguity is eliminated by the Aspen Policy itself, which Aspen concedes has provisions that provide building coverage for the Lawrenceville factory.  In addition, Plaintiffs point to the

---

[16] Counsel represented at oral argument that Mr. Potter was not deposed in the case.

[17] A principal source of confusion is the use and meaning of the term "BPP" coverage in the August 8, 2005 Application.  Application, Def.'s Ex. 22.  Aspen contends that "BPP" refers to "business personal property coverage" and Plaintiffs contend that it can be read to refer to the "Building and Personal Property" coverage extended by the policy itself through the Building and Personal Property Coverage Form that is part of the policy.

communications they received at the time the policy was issued in which Franey references coverage for "the building" and later communications from Franey in which Franey states that "[y]our building is insured on a replacement cost value." Summary, Pls.' Ex. 16, at 9. Central to the parties' respective positions is their dispute concerning whether Franey is Plaintiffs' or Aspen's agent for the purpose of determining whether and how the communications that preceded the issuance of the Aspen Policy impose contractual consequences on the parties. As discussed below, the issue of agency can be resolved as a matter of law and the factual disputes mentioned above are not material to the resolution of the parties' respective motions. Although, the doctrines of scrivener's error and mutual mistake are related, they are distinct theories with different elements and considerations. For that reason, the Court will consider them separately.

        a.     Scrivener's Error

In Virginia, as elsewhere, a "scrivener's error" presents a narrow and demanding exception to the general rule that a court is not permitted to rewrite a document or add terms not included by the parties. *See Westgate at Williamsburg Condominium Assoc., Inc. v. Philip Richardson Co.*, 270 Va. 566, 575-76, 621 S.E.2d 114, 118 (2005). The Supreme Court of Virginia most recently discussed the doctrine of scrivener's error in *Westgate*.

The Supreme Court of Virginia began its analysis by squarely embracing the "well-settled [rule] that a court is not permitted to rewrite a document or add terms not included by the parties." *Id.* at 575, 621 S.E.2d at 118. The Court recognized, however, an exception to this rule on the grounds that scrivener's errors "are difficult to prevent, and . . . no useful social purpose is served by enforcing . . . mistaken term[s]." *Id.* (quoting *S.T.S. Transport Service, Inc. v. Volvo White Truck Corp.*, 766 F.2d 1089, 1093 (7th Cir. 1985)). Nevertheless, the Court emphasized

that it "must construe that term [*i.e.*, scrivener's error] narrowly" because a change to a document based on a "scrivener's error" represents a significant exception to the well-established rules promoting the certainty of written contracts. *Id.* (citing *Davis v. Mullins*, 251 Va. 141, 149, 466 S.E.2d 90, 94 (1996)). The Court cited to the holdings and observations of other courts that scrivener's errors tend to occur singularly and are not "continuous, ongoing, and repeated." *Id.* at 576, 621 S.E.2d at 119 (quoting *Estate of Blakely v. Federal Kemper Life Assurance Co.*, 267 Ill. App. 3d 100, 106, 640 N.E.2d 961, 966 (1994)). Moreover, scrivener's errors "are those which are 'demonstrably contradicted by all other documents,'" *id.* at 575, 621 S.E.2d at 119 (quoting *Wellmore Coal Corp. v. Harman Mining Corp.*, 264 Va. 279, 283, 568 S.E.2d 671, 673 (2002)), and are "such errors as those evidenced in the writing that can be proven without parol evidence," *id.* at 576, 621 S.E.2d at 119 (citing *Blakely*, 267 Ill. App. 3d at 106, 640 N.E.2d at 966). Whether a scrivener's error exists is a question of law. *Id.* at 574, 621 S.E.2d at 118.

In *Westgate*, the Court concluded that the inclusion of a certain parcel of land in the deed transferring land to the plaintiff condominium association was not a scrivener's error. The Court observed that the error was neither typographical nor clerical. There had been extensive review of the document transferring the land and there was no drafting error in the sense that the scrivener had mistransposed the metes and bounds of the property to be conveyed or ignored suggested changes to the document. Rather, the property plat and description failed to conform to the developer's intent. The error occurred in the developer's review of the relevant documents. As the Court observed, "the fact that a party's intent was not fully reflected cannot be attributed to an error of the scrivener. Instead, the error lies with the party's inattention to the detail before him." *Id.* at 578, 621 S.E.2d at 120.

16

Based on *Westgate* and the other authority cited therein, Aspen's claim that the Aspen Policy's inclusion of building coverage is a scrivener's error fails for several reasons. First, there is nothing on the face of the policy that would suggest that the coverages were intended to be different than what is listed. This is not a case where building coverage is listed in one part of the policy but disclaimed in another or where the building coverage listed in one part is inconsistent with some other provision of the policy. In fact, building coverage is part and parcel of the Building and Personal Property Coverage Form, whose application to the policy is separate from and independent of the checked box relied on by Aspen.

Second, and similarly unavailing, is Aspen's contention that in evaluating whether there is a scrivener's error, this Court should look outside the Aspen policy and review other documents that were part of the application and underwriting process. Aspen asserts that the "X" in the box indicating building coverage is demonstrably contradicted by "all other documents," including the insurance application, the written quotation for property coverage, and the written binder of property coverage.

Under Virginia law, whether there is a scrivener's error must be decided based on the policy itself and not any parol evidence, particularly where, as here, the policy disclaims any other agreements other than those set forth in the policy. *See* Policy, Common Policy Conditions, Section B. These documents cited by Aspen fall outside the four-corners of the insurance contract. As such, they constitute parol evidence and therefore cannot be used to prove a scrivener's error. *Id.* at 575-76, 621 S.E.2d at 119 (citing *Blakely*, 267 Ill. App. 3d at 106, 640 N.E.2d at 966 ("The error was not evidenced in the writing and cannot be proven now without

17

parol evidence.")).[18] Nor is the insurance application properly viewed as incorporated by reference into the policy. The reference to the application is not by name but rather as a "schedule" solely for the purposes of identifying the location of the insured properties. Were it Aspen's intention to incorporate the entire application, it would or should have so stated. Moreover, any claim that the application is incorporated into the policy is further belied by Aspen's disclaimers at the time it issued the policy that the application was irrelevant to the scope of coverage provided under the policy.[19]

There is no contention here that the Aspen Policy's building coverage was the result of an inadvertent or an unintentional checkmark. The Aspen Policy was reviewed multiple times by different people within Aspen before its issuance; and there is no claim that the policy that was issued was something other than what was intended to be issued as a result of that review process. The error was not typographical or clerical. Rather, Aspen contends that after the fire, it concluded that the Aspen policy, as issued, did not conform to what the parties intended. As in *Westgate*, any error is the result of "the party's inattention to detail." *Id.* at 578, 621 S.E.2d at 120. Just like the developer in *Westgate*, Aspen reviewed the document multiple times and had assumed that it was correct.

Moreover, building coverage is not inconsistent with the scope of coverage referenced elsewhere in the Aspen Policy. Building coverage is reflected not only in the Valuation section

_____

[18] The language in *Westgate* cited by Aspen that scrivener's errors are those that are "demonstrably contradicted by all other documents" comes from cases that do not involve, as here, an integrated contract, but rather documents such as trial transcripts or court orders. *Westgate* makes clear that when one considers the doctrine of scrivener's error with respect to an integrated contract, the error must be "evidenced in the writing that can be proven without parol evidence." *Id.* at 576, 621 S.E.2d at 119.

[19] *See* Policy, Common Policy Conditions, Section B, Pls.' Ex. 9; *see also* Notice, Pls.' Ex. 15.

but also, if not primarily, through the applicable ISO Special Form that provides Building and Personal Property Coverage.  Moreover, Endorsements 3 and 4 to the Aspen Policy may be reasonably understood to reaffirm building coverage for the Lawrenceville property, after it had been eliminated for the Ronda, North Carolina property.[20]  Viewed in this light, the building coverage in the Aspen Policy is "continuous, ongoing, and repeated."  Based on the foregoing, the Court finds as a matter of law based on undisputed facts that the building coverage provided by the Aspen policy for the Lawrenceville property is not a scrivener's error and that the building coverage afforded under that policy for the Lawrenceville property may not be avoided on the basis of that doctrine.

      b.    Mutual Mistake

Aspen seeks reformation of the Aspen Policy on the grounds of mutual mistake.[21]  Reformation "provides relief against a mistake of fact in a written instrument" where clear and convincing evidence demonstrates that "both parties [enter into a written agreement] mistakenly believing it reflects their antecedent bargain." *Ward v. Ward*, 239 Va. 1, 4, 387 S.E.2d 460, 462 (1990) (citing Gibbs *v. Price*, 207 Va. 448, 449-50, 150 S.E.2d 551, 552 (1966)).  "In determining whether a mutual mistake of fact existed at the time of the agreement, the inquiry is not . . . who initially made the mistake, but rather, whether each party held the same mistaken belief with respect to a material fact at the time the agreement was executed." *See, e.g., Collins*

---

[20] Endorsement 3 provides that effective December 1, 2005, insurance coverage for the Ronda, N.C. location, including "Building and Personal Property" coverage, is deleted from the policy.  Endorsement 4 amends Endorsement 3 and also provides that "Building and Personal Property" coverage for the Ronda, N.C. location is deleted from the policy.

[21] Aspen is not claiming unilateral mistake based Plaintiffs' deceit, fraud, or inequitable conduct.  *See* Mem. in Opp. to Pls.' Mot. for Summ. J. at 14.  The Court, therefore, need not consider whether reformation is appropriate based on a unilateral mistake.

*v. Dep't of Alcoholic Beverage Control*, 21 Va. App. 671, 681, 467 S.E.2d 279, 283, *aff'd on reh'g en banc*, 22 Va. App. 625, 472 S.E.2d 287 (1996).

This doctrine, like the doctrine of scrivener's error, undermines the integrity and certainty of contracts; and a court will not reform a written agreement on those grounds unless there is clear and convincing evidence of mutual mistake. *See, e.g., Morris Oil Corp. v. Maryland Cas. Co.*, 136 F. Supp. 63, 65 (W.D. Va. 1955) ("nothing less than evidence that is plain and convincing beyond reasonable controversy will constitute such proof as will warrant a modification or reformation of a written agreement."); *Royal Ins. Co. v. City of Morgantown, West Virginia*, 98 F. Supp. 609 (N.D.W.V. 1951); *Wilkinson v. Dorsey*, 112 Va. 859, 72 S.E. 676 (1911) (to warrant relief on account of mistake, it must be "established by the clearest and most satisfactory evidence. It is not enough to show a possibility or even a probability of mistake."); *see also Dickenson County Bank v. Royal Exchange Assurance of London, England*, 157 Va. 94, 104, 160 S.E. 13, 16 (1931) ("the proof must be clear, convincing, satisfactory, and such as to leave no reasonable doubt on the mind that he writing does not correctly embody the intention of the parties"). Moreover, all of these principles must be applied consistent with the mandate that an insurance policy is to be strictly construed against the insurer and in favor of the insured.[22] *See Thompson v. Phoenix Ins. Co.*, 136 U.S. 287, 297 (1890). To prove a mutual mistake, the challenging party, in this case Aspen, bears a high degree of proof. *Dickenson County Bank*, 157 Va. at 103, 160 S.E. at 16. Aspen must prove that the parties had in fact agreed that the Aspen Policy would not include building coverage. *Id.* (defendant must show that "there has been a

---

[22] In light of these rules of contract interpretation, it is not surprising that Aspen has cited no case that has used the doctrine of mutual mistake to narrow coverage provided on the face of an insurance policy.

meeting of minds - their agreement actually entered into, but the contract . . . does not express what was really intended by the parties thereto").

Aspen indeed contends that the facts demonstrate that the parties never intended building coverage to be provided. Specifically, Aspen points to the August 8, 2005 Application prepared by Franey, the subsequent quote provided by Aspen, and All Risks' instruction to "bind" Aspen's quote. In response, Plaintiffs contend that they never received or reviewed the August 8, 2005 Application, the May 25, 2005 Proposal or the binder before the Aspen Policy was issued and that after they received the Aspen Policy, they read the policy and confirmed that it included the coverage they requested – including building coverage. In support of their assertion that they intended to procure an insurance policy including building coverage, Plaintiffs submitted the affirmation of Mr. Stuart-Paul, President of Atlantic, who states: "I requested Joe Potter of Franey Muha Alliant to obtain building coverage to protect ART's [Atlantic's] interest in the building." Pls.' Ex. 11.[23] Thus, Plaintiffs contend that there is no evidence of mistake on their part, and that if there was a mistake, it was a unilateral mistake by Aspen or one of Aspen's agents. Aspen replies that, even accepting Mr. Stuart-Paul's testimony that he requested building coverage from Franey, this request was never communicated to Aspen.

Central to this dispute is whether during the application and underwriting process Franey, and therefore Mr. Potter, is considered an agent of Plaintiffs or Aspen. Aspen claims that Franey is Plaintiffs' agent and not Aspen's agent. Aspen points out that it never retained or appointed Franey as its broker or agent, that Plaintiffs actually entered into a written agreement with Franey to act on Plaintiffs' behalf and that Franey in fact acted on behalf of Plaintiffs throughout the

21

application process.  Therefore, Aspen argues that Plaintiffs are bound by Franey's actions, knowledge, and understandings with respect to the Aspen Policy.  Aspen has also submitted the deposition testimony of Franey, through its designated representative, Mr. Kevin Bartley, and All Risks, through its designated representative, Mr. Calvin Leslie Wright, Jr., that building coverage was never requested from Aspen and the Aspen proposal and the subsequent "binder" did not include building coverage.  *See* Def.'s Exs. 14, 20.  Based on this record, Aspen argues that despite any disputes that may exist between Plaintiffs and Franey concerning whether Plaintiffs asked Franey to obtain building coverage, Aspen and Franey are in agreement that Aspen was never asked to issue building coverage and that Plaintiffs are bound by the mutual agreements and understandings reached between Franey, which Aspen views as Plaintiffs' agent, and Aspen, through All Risks.

Plaintiffs, on the other hand, cite Va. Code Ann. § 38.2-1801, which provides in pertinent part that "[a] licensed agent shall be held to be the agent of the insurer that issued the insurance sold, solicited, or negotiated by such agent in any controversy between the insured or his beneficiary and the insurer."  Although the statute does not necessarily mandate that a licensed agent is a general agent of the insurer, the statute specifically provides that a licensed agent selling, soliciting or negotiating insurance is deemed an agent of the insurer.  *See, e.g., Early Settlers Ins. Co. v. Lay*, 19 Va. Cir. 125, No. 83714, 1990 WL 751427, at *2 (Va. Cir. Ct. Feb. 20, 1990) ("It appears to be well-recognized that the agency created by statute, such as the one in effect in Virginia in 1986, is limited to matters related to the specific transactions named in the statute, i.e., soliciting or effecting an application for insurance.").

---

[23] *See supra* note 16.

22

Based on the record before the Court, the actions of Franey material to this litigation fall squarely within Va. Code Ann. § 38.2-1801 and as a matter of law, Franey is to be considered the statutory agent of the Aspen, the insurer, when selling, soliciting or negotiating insurance. This conclusion based on the statute appears consistent with Virginia common law. *See Pacific Fire Ins. Co. v. Bowers*, 163 Va. 349, 354-55, 175 S.E. 763, 765 (1934) ("A broker is the agent for the insured . . . though at the same time for some purposes he may be the agent for the insurer. . . . [W]here an insurance agent . . . procures insurance in a company not represented by himself, either by direct application to the company or through an agent of such company, he acts as the agent of the insurer and not of the assured . . ."); *see also Harris v. K&K Ins. Agency, Inc.*, 249 Va. 157, 161, 453 S.E.2d 284, 286 (1995) ("Although a broker is an agent for the insured, he also may be, at the same time, an agent for the insurer for certain purposes."). There is no dispute that the understandings Aspen claims were reached concerning the Aspen Policy before its issuance were reached during the process of "selling, soliciting or negotiating insurance." For the purpose of resolving this coverage dispute, the relevant legal relationship between Aspen and Franey is therefore defined by Va. Code Ann. § 38.2-1801. As a result, any agreement or understanding that Aspen had with respect to the scope of coverage was with companies deemed to be its own agents and not those of Plaintiffs.

There is also no evidence that Plaintiffs ever intended or agreed not to include building coverage in the Aspen Policy. Plaintiffs have submitted declarations that they specifically requested building coverage from Mr. Potter of Franey and that Mr. Potter latter confirmed that Plaintiffs had requested that coverage. This evidence has not been refuted. The testimony Aspen submitted from Franey and All Risks simply affirmed through persons other than Mr. Potter that

they did not think the insurance application or other communications with Aspen requested building coverage. There is no evidence of any communications with the Plaintiffs themselves in which Plaintiffs agreed to exclude building coverage. On the contrary, the written communications with the Plaintiffs include explicit warnings that the scope of coverage under the Aspen Policy is determined by the policy itself, and that specifically disclaim the insurance application as relevant for that purpose. Any mistake, therefore, is a unilateral mistake on the part of Aspen and its statutory agents. Aspen has not demonstrated by clear and convincing evidence that neither Plaintiffs nor Aspen intended that the Aspen Policy to provide building coverage. Thus, the record here falls short of the high threshold required to establish a mutual mistake.[24]

## 2. Insurable Interest

Under Virginia law, "[n]o insurance contract on property or on any interest therein or arising therefrom shall be enforceable except for the benefit of persons having an insurable interest in the property insured." VA. CODE ANN. § 38.2-303(A) (1952); *see also Castle Cars, Inc. v. United States Fire Ins. Co.*, 221 Va. 773, 775, 273 S.E.2d 793, 794 (1981) ("[A] property insurance contract is void unless the insured has an 'insurable interest' in the property insured." (quoting J. Appleman, INSURANCE LAW AND PRACTICE, § 761 (1941))); *Liverpool & London & Globe Ins. Co. v. Bolling*, 176 Va. 182, 187, 10 S.E.2d 518, 520 (1940) (a contract of insurance is void as against public policy if one insures the property of another). By statute, an "insurable

---

[24] Because the Court concludes that the building coverage provided by the Aspen Policy is neither a result of a scrivener's error nor a mutual mistake, the Court need not consider Plaintiffs' arguments that Aspen is estopped from claiming mistake, that reformation is barred by the doctrine of laches, or that Aspen's tenth affirmative defense should be stricken.

interest" is defined as "any lawful and substantial economic interest in the safety or preservation of the subject of insurance free from loss, destruction or pecuniary damage." VA. CODE ANN. § 38.2-303(B).

Aspen contends that Atlantic, a lessee, lacks an insurable interest in the Lawrenceville property.[25] Atlantic claims that its rights and obligations under the lease with IDA constitute a "lawful and substantial economic interest in the safety or preservation" of the Lawrenceville property that creates an insurable interest sufficient to support the Aspen policy's building coverage. Specifically, Atlantic points to (1) its obligations under the lease to maintain the property in "as good a condition" as existing at the beginning of the lease term; (2) its obligation to "restore possession" of the property to IDA at the end of the lease term "in good condition, reasonable wear and tear excepted" and (3) its option to purchase the building for a fixed price that is reduced by a portion of each monthly rent payment. These provisions, Atlantic contends, have the potential to impose pecuniary losses on Atlantic as a result of fire damage to the building both in terms of its legal liabilities to IDA and also with respect to the value of its purchase option and the rent credit against the option price. Therefore, Atlantic asserts that it had

_____

[25] Plaintiffs raised the issue of insurable interest in their Motion for Summary Judgment after observing that "Aspen, in an attempt to escape the clear language of the policy, asserts that the Plaintiffs have no insurable interest in the building." Mem. in Supp. of Pls.' Mot. for Summ. J. at 8. In their reply, and at oral argument, Plaintiffs' argued that Aspen had failed to assert lack of insurable interest as an affirmative defense, and that the Court should not consider Aspen's position on that grounds. *See* Fed. R. Civ. P. 8(c) ("In responding to a pleading, a party must affirmatively state any avoidance or affirmative defense"). This Court need not reach whether the issue of lack of insurable interest was properly pleaded in this case since it is clear that it was raised during the litigation and fully addressed by the parties. It is clear from Plaintiffs' Motion for Summary Judgment that Plaintiffs were on notice of Aspen's position that they lacked sufficient interest in the building to support the issuance of building coverage and addressed that contention in their motion and opening brief. Under these circumstances, the Court concludes that Plaintiffs have not been prejudiced by any failure on the part of Aspen to plead formally as an affirmative defense the issue of insurable interest. *See* Fed. R. Civ. P. 8(e); *see also* Fed. R. Civ. P. 15(a)(2). Moreover, given the clear statutory mandate, reflecting public policy, that where an insured lacks an insurable interest, the contract shall not be enforceable, the Court may properly determine whether an insurable interest exists even if the issue was not raised by the parties. *See* VA. CODE ANN. § 38.2-303(A).

the ability to protect itself and "the value of its option to purchase" through insurance. Pls.' Reply Mem. at 2-3. With respect to the purchase option, Atlantic claims that "the precise risk" it sought to insure was the risk that it "would be purchasing a property whose value was diminished as a result of a fire loss." *Id.* at 5.

Aspen, on the other hand, contends that Atlantic's unexercised option to purchase is a "mere expectancy or future opportunity" that is far more attenuated and contingent than any insurable interest recognized to date by a Virginia court. Def.'s Opp. to Pls.' Mot. for Summ. J. at 6. For that reason, Aspen argues that Atlantic is not exposed to the kind of immediate economic loss that courts have required before finding an insurable interest. *Id.* Indeed, unless Atlantic exercises its option or IDA makes a future claim against it based on the condition of the property, Atlantic may never in fact realize a loss. Aspen also points out that Atlantic does not pay separately for the option and therefore it "does not represent any present economic investment in the property for which insurance protection would be required to make Atlantic whole in the event of a loss." *Id.* Aspen also argues that under the lease between IDA and Atlantic, Atlantic is essentially insulated from the legal liabilities and losses that Atlantic relies on to establish insurable interest. Specifically, Aspen asserts that it is IDA's obligation under the lease to obtain building insurance at Atlantic's expense, which IDA in fact secured independently of Aspen. Aspen also claims that if Plaintiffs are also permitted to obtain building coverage, the result would be improper double recovery. Aspen thus raises the specter of "improper contract wagering or the opportunity to profit from a loss" if Atlantic's interest in the building is deemed an insurable interest. *Id.* at 6-7. Aspen also asserts that recoveries based on an interest such as the one Atlantic possesses would violate the fundamental rule that indemnity insurance is to put

26

an insured in the same (but not better) position the insured would have occupied had no loss occurred.[26] *Id.*

Virginia courts have not ruled on whether a commercial lessee has an insurable interest in a rented building under the circumstances presented in this case. In particular, Virginia courts have not yet ruled on whether an unexercised option to purchase a building constitutes a sufficient insurable interest to support building casualty coverage. This Court's obligation therefore is to predict as best it can how this case would be decided under Virginia law by a Virginia court. *See Private Mortgage Investment Servs., Inc. v. Hotel and Club Assocs., Inc.*, 296 F.3d 308, 312 (4th Cir. 2002); *Liberty Mut. Ins. Co. v. Triangle Indus.*, 957 F.2d 1153, 1156 (4th Cir. 1992). In predicting how Virginia courts may rule, this Court may also consider cases from other jurisdictions, as well as restatements of law and treatises. *See, e.g., Private Mortgage Investment Servs., Inc.*, 296 F.3d at 312; *see also Telectronics Int'l, Inc. v. CAN Ins. Co.*, 120 Fed. Appx. 440, 444, No. 04-1509, 2005 WL 115487, at * 4 (4th Cir. 2005). Moreover, "'when better indicators are not available, the trend factor is one that must be considered. [However] [t]he primary legal indicators for diversity courts should be what the courts of the state have most recently said and what basic doctrinal premises they have seemed most consistently to hold rather than the way the general law may be trending.'" *White Catten v. Zimmer, Inc.*, 1983 U.S. Dist. LEXIS 16243, at *5 (W.D. Va. 1983) (citations omitted). While Virginia courts have considered what constitutes an insurable interest in only a handful of reported cases, those rulings set forth the general principles adopted and applied by Virginia courts when determining whether and to

---

[26] This indemnity principle appears to find expression in Section E.4.d.of the Building and Personal Property Coverage Form in the Aspen Policy, which provides that "[w]e [Aspen] will not pay you [Atlantic] more than your financial interest in the Covered Property."

what extent an insurable interest exists.

In *Tilley v. Connecticut Fire Ins. Co.*, 86 Va. 811, 11 S.E. 120 (1890), a case that pre-dates the adoption of any statutory definition of insurable interest, the Supreme Court of Appeals of Virginia explained that "[a]ny person who has an interest in the property, legal or equitable, or who stands in such a relation thereto that its destruction would entail pecuniary loss upon him, has an insurable interest to the extent of his interest therein, or of the loss to which he is subjected by the casualty." 86 Va. 811, 11 S.E. 120, 120 (1890). In *Liverpool and London and Globe Insurance Company, LTD v. Bolling*, a case that also pre-dates the statutory definition of insurable interest, the Supreme Court of Appeals of Virginia noted that "[e]verywhere there is a tendency to broaden the definition of an 'insurable interest;' neither legal nor equitable title is necessary." 176 Va. at 187, 10 S.E.2d at 520. The Court also reaffirmed the above cited language in *Tilley* and further cited with approval the following:

> Any title or interest in the property, legal or equitable, will support a contract of insurance on such property. The term 'interest,' as used in the phrase 'insurable interest' is not limited to property or ownership in the subject matter of the insurance. Where the interest of insured in, or his relation to, the property is such that he will be benefited by its continued existence or suffer a direct pecuniary injury by its loss, his contract of insurance will be upheld, although he has no legal or equitable title.

*Id.* at 188, 10 S.E.2d at 520.

Virginia courts have applied these principles in a variety of circumstances. In *Blue Cross of Southwestern Va. and Blue Shield of Southwestern Va. v. McDevitt & Street Co.*, the Supreme Court of Virginia held that a contractor and architect had insurable interests in property where "until final payment was made, the property constituted inchoate security for the payment of contract debts due the contractor and the architect." 234 Va. 191, 196, 360 S.E.2d 825, 827

28

(1987). In *Castle Cars, Inc. v. U.S. Fire Ins. Co.*, the Court held that a plaintiff that acquired a stolen car in good faith and without notice of the invalidity of the transferor's title had an insurable interest. 221 Va. 773, 777-78, 273 S.E.2d 793, 795-96 (1981) (such an interest need not be legal or equitable title; "a 'substantial economic interest' is an insurable interest if it is 'lawful'"). Considering § 38.2-303's predecessor statute in *Home Ins. Co. of N.Y. v. Dalis*, the Supreme Court of Appeals of Virginia made clear that the definition of an insurable interest contemplated an expansive reach. 206 Va. 71, 76, 141 S.E.2d 721, 724 (1965). In that case, the Court held that the plaintiffs continued to have an insurable interest at the time of loss even though they no longer held legal title to the property on the day of loss, title having already passed to the State Highway Commissioner through a condemnation proceeding. Because the time had not yet expired for the condemnation to be abandoned, and there was still the possibility that title would revert back to the plaintiffs in the event of an abandonment of the condemnation, the Court reasoned that "the plaintiffs would have a pecuniary interest in protecting the buildings against loss by fire." *Id.* at 76, 141 S.E.2d at 724. The Supreme Court of Virginia has also recognized that a lessee may have an insurable interest under the terms of the lease agreement.[27] In *Phoenix Ins. Co. v. Shulman Co.*, for example, the Supreme Court of Appeals of Virginia held that, under the terms of the lease, a lessee had an insurable interest in improvements since, in the case of partial destruction, a lessor was bound to repair only to the extent of restoring the

---

[27] Here, Aspen Policy PP000508 does not require legal or equitable title or ownership of the insured property and the parties do not dispute that the August 8, 2005 Application discloses that Atlantic is a lessee of the Lawrenceville property. *See generally Virginia Fire & Marine Ins. Co. v. Lennon*, 170 Va. 766, 785-86, 125 S.E. 801, 807 (1925) ("When the true ownership is not required to be stated by the conditions of the policy, generally it will be sufficient if the insured has an insurable interest; but when such requirement is the condition of the policy it becomes a material part of the contract, and all rights under it are forfeited by noncompliance.").

premises to the condition in which they were when the lease was executed. 125 Va. 281, 99 S.E. 602 (1919).

On the other hand, Virginia courts have applied limits to the concept of an insurable interest. Most recently, in *Nationwide Ins. Co. v. Dudley*, the Norfolk Circuit Court held that where the property had already been foreclosed upon and sold by the bank, the prior owner did not have an insurable interest in the property. The Court went on to state that "[i]t is not sufficient to suggest that another was holding the property under a 'friendly arrangement' for and on behalf of" the prior owner. 55 Va. Cir. 446, No. L99-337, 2000 WL 33942738, at *3 (Va. Cir. Ct. Feb. 10, 2000).

Courts in other jurisdictions that have addressed this issue have considered many of the same principles adopted by the Virginia courts. *See generally* 74 A.L.R. 4th 883.[28] In *Kelly v. Iowa Valley Mut. Ins. Ass'n.*, for example, the Supreme Court of Iowa concluded that an unexercised option was sufficient to confer an insurable interest on a lessee. 332 N.W.2d 330, 332 (Iowa 1983) (Plaintiff "had an insurable interest in the leased property with or without exercising his option to purchase."); *see also Travelers Indem. Co. v. Duffy's Little Tavern, Inc.*, 478 So.2d 1095, 1096 (Fla. App. 1985) (where the "lease contained an option to purchase but the said option operated independently of the rental payments and the option was never exercised . . .

---

[28] Among the factors considered by these courts are whether (1) the option was exercised; (2) the lease-option contract required the lessor or lessee to furnish insurance or provided to whom the insurance proceeds should be paid; (3) the lessor made any claim to the insurance proceeds; (4) the insurance policy contained provisions limiting the insurable interest; (5) the lessor made improvements before the loss or repairs or replacements after the loss; (6) the loss would actually fall on the lessor or the lessee; (7) denial of the lessee's insurable interest would cause substantial injury to the lessee; (8) the lessee stood to lose the remaining term of the lease; the utility of the purchase option, or a rent credit on the option price; (9) the lessee had paid any part of the purchase price; (10) the lessee had assumed any part of a mortgage debt owed on the lease premises; (11) the lessee lived on the leased premises.

it is clear the [lessee] did not have equitable or legal title to the realty. . . . However, while the [lessee] did have an insurable interest in the premises as a lessee public policy of Florida prohibits recovery of insurance proceeds in excess of one's insurable interest.")[29]; *but see also Erie-Haven, Inc. v. Tippmann Refrigeration Constr.*, 486 N.E.2d 646, 650 (Ind. App. 1985) ("Both the lessor and the lessee have an insurable interest in the property which is the subject of the lease. . . . Although the holding of an unexercised option does not create a present interest in property in the lessee, a lessee has an interest in the property to the extent of the unexpired term of the lease. In addition, a lessee who makes improvements on the leased property has an insurable interest in those improvements." (internal citations omitted)). Other courts have also found that a lessee has an insurable interest where the lease requires the tenant to surrender the premises in the same condition as when the lease began. *See generally* 44 AM. JUR. 2D INSURANCE § 961 ("A tenant or lessee of property for any specified period of time has an insurable interest in the premises. In particular, a lessee who, by the terms of the lease, is required to surrender the leased premises in the same condition as when the lessee took possession, has an insurable interest in the property.").

Virginia law makes clear that the primary inquiry is whether and to what extent the economic interests of a person are exposed to a pecuniary loss. Moreover, whether an "insurable interest" exists is a broad inquiry, with economic realities prevailing over legalisms, such as whether the insured holds legal or equitable title to the property. As referenced above, Virginia

---

[29] The Florida court "therefore reverse[d] the final judgment and remand[ed] the case to the trial court for a determination of the [lessee's] insurable interest in the leased premises at the time of the fire loss, which may include the value of the use of the building during the unexpired term of the lease as well as the value of the leasehold improvements; the value of the contents and/or personal property belonging to the appellee and destroyed as a result of the fire; and such other relief as deemed necessary by the court." *Travelers Indem. Co.*, 478 So.2d at 1096.

courts have found an insurable interest where the insured has an ownership interest, a leasehold interest, or a contract right or contract obligation. *See, e.g., McDevitt & Street Co.*, 234 Va. at 196, 360 S.E.2d at 827 (contract right or contract obligation); *Phoenix Ins. Co.*, 99 S.E. 602 (leasehold interest). It also appears that an insurable interest may be predicated, at least in part, on some future contingency or event. *See Dalis*, 206 Va. at 76, 141 S.E.2d at 724 (future events that might restore title to insured); *Bolling*, 176 Va. 182, 10 S.E.3d 518 (future inheritance of property). However, while the concept of an insurable interest is broad and expansive, it has limits and there is a point beyond which an insured's economic interests become so attenuated, remote or contingent as to become uninsurable.

Central to the Court's analysis are the policies and considerations embodied in the indemnity principle relied upon by Aspen in this case to resist the finding of an insurable interest. As a matter of public policy, that principle requires that an insured obtain insurance only to the extent necessary to indemnify him from his own determinable losses. *See generally* APPLEMAN ON INSURANCE § 3.1 (2d ed. 1996); COUCH ON INSURANCE § 175:6 (3d ed.). The concept of an insurable interest raises two considerations. The first consideration is whether an insured is so situated with respect to property as to suffer pecuniary loss from its destruction. *Tilley*, 86 Va. 811, 11, S.E. 120. The second consideration is whether an insured's recovery for that destruction can be calculated in such a way that it is limited to an amount no more than necessary to indemnify him for his loss, as measured by his insurable interest. For this reason, an insurable interest with respect to a particular property is specific to the insured and different people can have different insurable interests, with different recoveries as a result of the same coverage. *See id.; McDevitt & Street Co.*, 234 Va. at 196, 360 S.E.2d at 827 (both contractor and architect had

32

insurable interests). It would also follow that different insureds with different insurable interests may be impacted differently by the same property damage.

Here, it is undisputed that Atlantic is a lessee of the Lawrenceville property and that the initial term of the lease was for five years, commencing on August 1, 2004.[30] It is also undisputed that the lease contains a purchase option which grants Atlantic the option to purchase the building at any time during the term of the lease for $912,500.00, and that a portion of each monthly rental payment is credited towards the fixed purchase price, such that damage to the property might very well affect the value of the building and the value of the option. Additionally, Atlantic not only operates its business on the premises and would be fundamentally affected by damage to the property, but the lease agreement also places certain obligations on Atlantic "to maintain the Property in as good a condition as now exists, normal wear and tear excepted." Lease, Pls.' Ex. 1, at ¶ 11. The lease provisions thus impose a financial risk on Atlantic in the event of damage to the property.

Given its relationship to the Lawrenceville property, Atlantic has a clear economic interest in the property that would provide an incentive to prevent loss or damage to the Lawrenceville property. Atlantic has not exercised the option that would cause it to receive ownership of the Lawrenceville property and therefore has not obtained title to property that may have been worth more before the fire than after it. Nevertheless, there is no question that the value of that option can be affected by damage to the Lawrenceville property for which Atlantic would be indemnified through the building coverage. However, Atlantic has not replaced the

---

[30] Unless the property is damaged to the extent that it cannot be occupied by Atlantic, the lease does not provide for early termination by Atlantic.

33

damaged insulation and therefore has not incurred the expense that would be payable under the replacement coverage afforded under the building coverage. Similarly, the lease has not terminated and the landlord has not made any claim based on Atlantic's obligation to return the property in "good condition." Thus, these "losses" are prospective and contingent. Nevertheless, the prospect of these losses is substantial and not merely theoretical and the reality of this potential loss exposure would reasonably motivate Atlantic to obtain building coverage.

This Court finds that a Virginia court applying Virginia law would conclude that Atlantic's interests and obligations with respect to the Lawrenceville property come within the statutory definition of an insurable interest. The interests that Atlantic has with respect to the Lawrenceville property are "lawful," "substantial" and "economic." They also are affected by "the safety or preservation of the subject of insurance free from loss, destruction or pecuniary damage." Noteworthy are Aspen's concerns that a recognition of Atlantic's contingent, indirect interests as insurable interests, particularly in light of the claimed damage to those interests, might violate the indemnity principle and result in a potential windfall or improper double recovery. Those concerns, however, are best addressed, not through a finding that no insurable interest exists under the broad statutory definition, but through the proper valuation of Atlantic's insurable interest and any calculable loss associated with those interests. The Court therefore concludes that Atlantic has an insurable interest in the Lawrenceville property.[31]

---

[31] Having determined that Atlantic has an insurable interest sufficient to sustain the building coverage under the Aspen Policy, there is still a dispute as to the amount of damages. Under the Aspen Policy, however, both Aspen and Atlantic have the unilateral right to request that the value of Atlantic's loss be determined through an appraisal process. Accordingly, the parties shall jointly advise the Court on or before January 30, 2009 whether either elects to have Atlantic's loss valued pursuant to the policy's appraisal process.

C.     **Recoverable Depreciation**

Defendant also seeks summary judgment on Plaintiffs' claim for "recoverable

depreciation." Count II of Plaintiffs' Amended Complaint requests a declaration "that the insurer

has an obligation to pay the actual cash value now and additional amount up to replacement cost

of the property as such time as it is repaired or replaced." Am. Compl. at ¶ 41. Specifically,

Plaintiffs seek a declaration that they are entitled to $93,529.66 for "recoverable depreciation."

The Aspen Policy provides Business Personal Property/Contents coverage that is valued

at Replacement Cost with 80% coinsurance. Section G.3. of the Building and Personal Property

Coverage Form provides that:

> a. Replacement Cost (without deduction for depreciation) replaces Actual Cash
> Value in the Loss Condition, Valuation, of this Coverage Form.
> . . .
> c. You may make a claim for loss or damage covered by this insurance on an
> actual cash value basis. In the event you elect to have loss or damage settled on
> an actual cash value basis, you may still make a claim for the additional coverage
> this Optional Coverage provides if you notify us of your intent to do so within 180
> days after the loss or damage.
> d. We will not pay on a replacement cost basis for any loss or damage:
> (1) Until the lost or damaged property is actually repaired or replaced; and
> (2) Unless the repairs or replacement are made as soon as reasonably possible
> after the loss or damage.

Plaintiffs contend that Va. Code Ann. § 38.2-2119 entitles them to the right to a

declaratory judgment for the amount of recoverable depreciation. That section provides in

pertinent part:

> Where any policy of insurance issued or delivered in this Commonwealth
> pursuant to this chapter provides for the payment of the full replacement cost of
> property insured thereunder, the policy shall permit the insured to assert a claim
> for the actual cash value of the property without prejudice to his right to thereafter
> assert a claim for the difference between the actual cash value and the full
> replacement cost unless a claim for full replacement cost has been previously

35

resolved. Any claim for such difference must be made within six months of (I) the last date on which the insured received a payment for actual cash value or (ii) date of entry of a final order of a court of competent jurisdiction declaratory of the right of the insured to full replacement cost, whichever shall last occur.

VA. CODE ANN. § 38.2-2119.

For a court to entertain an application for declaratory relief, it must appear that there is an actual controversy existing between the parties. *See, e.g., Orbe v. Johnson*, 267 Va. 568, 601 S.E.2d 543 (2004). An actual controversy must be one that is justiciable, meaning a controversy in which there are specific adverse claims, based upon present rather than future or speculative facts that are ripe for judicial adjustment. *City of Fairfax v. Shanklin*, 205 Va. 227, 135 S.E.2d 773 (1964). The Declaratory Judgment Act does not give courts the authority to render advisory opinions, to decide moot questions, or to answer inquiries that are merely speculative. *Reisen v. Aetna Life & Cas. Co.*, 225 Va. 327, 302 S.E.2d 529 (1983). Rather, declaratory judgment is appropriate to "guide parties in their future conduct in relation to each other, thereby relieving them from the risk of taking undirected action incident to their rights, which action, without direction, would jeopardize their interests." *Liberty Mut. Ins. Co. v. Bishop*, 211 Va. 414, 421, 177 S.E.2d 519, 524 (1970).

It is undisputed that Plaintiffs were insured for business personal property/contents loss. Plaintiffs acknowledge that "[o]nce the insured then repairs or replaces the item, the insurer has an obligation to pay the difference between the actual cash value and the replacement cost." Mem. in Opp. to Def.s' Mot. for Summ. J. at 28. The parties agreed that the actual cash value of the business personal property/contents loss was $524,479.80. Aspen has paid this amount, with the final payment of $310,014.61 being made on October 10, 2006. To recover the additional

coverage (*i.e.*, the difference between the actual cash value and replacement cost), Plaintiffs must (1) notify Aspen of their intent do make a claim for the additional coverage within 180 days after the loss or damage; (2) actually repair or replace the lost or damaged property; and (3) make the repairs or replacements as soon as reasonably possible after the loss or damage.

To be entitled to "recoverable depreciation," therefore, Plaintiffs must repair or replace the lost or damaged property. Aspen has not disputed its contractual obligation to pay "recoverable depreciation" once Atlantic actually replaces the lost or damaged property. *Rather*, Aspen asserts that Plaintiffs have not repaired or replaced the property at issue. Plaintiffs do not contest this fact. Instead, Plaintiffs seek in essence a declaration that *if* they comply with the contractual prerequisites, and actually repair or replace the lost or damaged property, they are entitled to "recoverable depreciation" under the insurance policy. This is not an actual controversy. Because Aspen has not disputed its contractual obligation under the Aspen Policy with respect to "recoverable depreciation" and Plaintiffs have not satisfied the preconditions to recovery of "recoverable depreciation" under section G.3 of the insurance contract, there is not an actual controversy and a declaratory judgment should not be issued. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiffs' request for a declaratory judgment that Plaintiffs are entitled to $93,529.66 for "recoverable depreciation" is granted.

## D.   Bad Faith

In Count III of Plaintiffs' Amended Complaint, Aspen seeks summary judgment as to Plaintiffs' claim for costs and attorney's fees pursuant to Va. Code Ann. § 38.2-209. Section 38.2-209 provides that:

> Notwithstanding any provision of law to the contrary, in any civil case in which an insured individual sues his insurer to determine what coverage, if any, exists under his present policy . . . the individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award. However, these costs and attorney's fees shall not be awarded unless the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy.

The Supreme Court of Virginia has held that § 38.2-209 "was intended to be both remedial and punitive and . . . that a standard of reasonableness should be applied in evaluating the conduct of the insurer." *Nationwide Mut. Ins. Co. v. St. John*, 259 Va. 71, 75, 524 S.E.2d 649, 651 (2000) (citing *CUNA Mut. Ins. Soc. v. Norman*, 237 Va. 33, 38, 375 S.E.2d 724, 726-27 (1989)). Specifically, the Court should consider "whether reasonable minds could differ in the interpretation of policy provisions defining coverage and exclusions; whether the insurer has made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and whether the defense the insurer asserts at trial raises an issue of first impression or a reasonably debatable question of law or fact." *CUNA Mut. Ins. Soc.*, 237 Va. at 38, 375 S.E.2d at 726-27 (the Court was interpreting the former Virginia Code § 38.1-32.1, now 38.2-209) (involving a matter of first impression in the jurisdiction and concluding that "[b]ecause we consider the issue of coverage reasonably debatable, we reject the finding of bad faith").

Section 38.2-209 does not create an independent cause of action. *Salomon v. Transam. Occidental Life Ins. Co.*, 801 F.2d 659, 661 (4th Cir. 1986); *Adolf Jewelers, Inc. v. Jewelers Mut. Ins. Co.*, No. 3:08-cv-233, 2008 WL 2857191, at *5 (E.D. Va. July 21, 2008); *see also U.S. Airways, Inc. v. Commonwealth Ins. Co.*, No. 03-587, 2004 WL 1094684, at *9 (Va. Cir. Ct. May

14, 2004) (holding that a party may not allege a "separate cause of action for bad faith" under

Section 38.2-209). Moreover, a party may seek relief under Section 38.2-209 only after a

judgment is entered against the insurer. *U.S. Airways, Inc.*, 2004 WL 1094684, at *9; *see also*

*Adolf Jewelers*, 2008 WL 2857191, at *5; *Cradle v. Monumental Life Ins. Co.*, 354 F. Supp. 2d

632, 635 (E.D. Va. 2005). In *U.S. Airways*, the court found that "a judgment against the insurer

acts as a condition precedent to any claim of bad faith in Virginia," and therefore granted

summary judgment, without prejudice, on the issue of bad faith on the grounds that the claim was

premature. 2004 WL 1094684, at *9; *see also Cradle*, 354 F. Supp. 2d at 635-36.[32]  The Court

finds the holding in *U.S. Airways* to be controlling on this issue. A claim under § 38.2-209 may

not therefore be brought as a separate cause of action as Plaintiffs have asserted in Count II, but

only as a source of recovery of costs and attorney's fees once a judgment is entered against the

insurer.[33]

In any event, the Court finds that Plaintiffs' bad faith claim fails on the merits. There is

nothing in the record to suggest that Aspen's denial of Plaintiffs' claim was made in bad faith.

While Aspen's asserted defenses of scrivener's error and mutual mistake have been rejected by

this Court, Aspen's position is not so unreasonable as to demonstrate bad faith. *See CUNA Mut.*

---

[32] As the Court noted in *Cradle*, "[s]everal federal district courts have addressed the question of bad faith before judgment in favor of plaintiff had been entered. . . . These courts were not faced with the same question before this Court, nor did these courts have the benefit of the US Airways opinion to guide analysis of existing Virginia precedent on the matter." *Cradle*, 354 F. Supp. 2d at 636 n.2; *see also Adolf Jewelers*, 2008 WL 2857191, at *5 ("Although this Court has ruled on a claim of bad faith before entering judgment against an insurance company, it did so before US Airways was decided, mitigating the force of those rulings." (internal citations omitted)).

[33] The Court need not decide if Plaintiffs' bad faith allegation is properly styled as a separate count because Aspen has not raised the issue. The Court does note that Plaintiffs' bad faith allegation is not an independent cause of action. Plaintiffs' complaint is sufficient, however, to notify Defendant that they plan to seek costs and attorney's fees.

*Ins. Soc.*, 237 Va. 33, 375 S.E.2d at 727 (reversing a district court's finding of insurer's bad faith because "the issue of coverage [was] reasonably debatable"). The coverage questions raised in this case were by no means settled under Virginia law. *See id.* (finding reasonable an insurer's reliance on a policy interpretation that was a matter of first impression in Virginia). The Court, therefore, finds an insufficient basis to award costs and attorney's fees under Va. Code Ann. § 38.2-209.

## V. CONCLUSION

For the foregoing reasons, the Court will GRANT Plaintiffs' Motion for Summary Judgment and GRANT in part and DENY in part Defendant's Motion for Summary Judgment.

An appropriate Order will issue.

_____
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
January 16, 2009